IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITIZENS FOR A PRO-LIFE SOCIETY, | ) | COMPLAINT AND JURY DEMAND |
| INC., RED ROSE RESCUE, LAURA GIES, | ) | |
| LAUREN HANDY, CLARA MCDONALD | ) | |
| (AKA "STEPHANIE BERRY"), MONICA | ) | |
| MILLER, CHRISTOPHER MOSCINSKI, | ) | |
| JAY SMITH (AKA "JUANITO | ) | |
| PICHARDO"), and AUDREY WHIPPLE, | ) | |
| | | |
| Defendants. | | |

The United States of America, by the undersigned counsel, asserts a civil cause of action seeking damages and injunctive relief under the Freedom of Access to Clinic Entrances Act (FACE Act), 18 U.S.C. § 248.

1. In bringing this action, the United States alleges that: (1) Defendants Citizens for a Pro-Life Society, Inc., Red Rose Rescue, Laura Gies, Lauren Handy, Clara McDonald, Monica Miller, Christopher Moscinski, Jay Smith, and Audrey Whipple, have committed, and are likely to continue to commit, violations of the FACE Act; and (2) various persons who provide or obtain reproductive health services are being, have been, and will continue to be injured, intimidated, and/or interfered with by the Defendants' conduct.

I. **JURISDICTION AND VENUE**

2. This Court has jurisdiction over this action pursuant to the FACE Act, 18 U.S.C. § 248 and 28 U.S.C. § 1345.

3. The United States is authorized to bring this action pursuant to the FACE Act, 18 U.S.C. § 248(c)(2).

4. Venue is proper in this judicial district, under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to this complaint occurred in this judicial district.

## II. PARTIES

5. Plaintiff is the United States of America.

6. Defendant Citizens for a Pro-Life Society, Inc. (CPLS) is a Michigan nonprofit corporation with its registered office at 67919 W 8 Mile Road, South Lyon, Michigan.

7. CPLS was organized to "form a public charity . . . that provides support to Pro-Life causes by raising awareness of critical and emerging human life issues through newsletters, website blogs and other public activities."

8. Defendant Red Rose Rescue (RRR) is an anti-abortion group that organizes events across the country in which participants trespass on the property of reproductive health services facilities and refuse to leave voluntarily in order to cause the facilities to stop operating. RRR has been active since at least 2017.

9. Defendant Monica Miller resides in South Lyon, Michigan. Miller incorporated CPLS and has been its president since its formation in 2009. Miller operates the RRR website, using it to solicit tax-deductible donations through CPLS. Despite numerous arrests and convictions arising from RRR events, Miller has publicly stated that RRR events "will continue" as long as abortion is legal in any state.[1]

---

[1] *Jury returns verdicts for 6 abortion protesters--Red Rose Rescue group charged with trespassing, other misdemeanors*, The Oakland Press,

10. Defendant Laura Gies resides in Spring City, Pennsylvania.

11. Defendant Lauren Handy resides in Alexandria, Virginia and is currently incarcerated at the William G. Truesdale Adult Detention Center in Alexandria, Virginia.

12. Defendant Clara McDonald, also known as Stephanie Berry, resides in Brooklyn, New York.

13. Defendant Christopher Moscinski resides in Bronx, New York and is currently incarcerated at the Central Detention Facility in Washington, D.C.

14. Defendant Jay Smith, also known as Juanito Pichardo, resides in Freeport, New York and is currently incarcerated at the Metropolitan Detention Center Brooklyn in Brooklyn, New York.

15. Defendant Audrey Whipple resides in Canton, Michigan.

### III. GENERAL FACTUAL BACKGROUND

16. Before the FACE Act was enacted in 1994, anti-abortion protestors used a variety of tactics to block entry to reproductive health services facilities in order to prevent providers and patients from providing or obtaining abortions.

17. In response, the FACE Act was enacted with bipartisan support "in the wake of continuing violence against, and other forcible interference with, abortion clinics, their staffs, and their clientele by radical elements of the anti-abortion movement." United States v. Soderna, 82 F.3d 1370, 1372 (7th Cir. 1996).

18. The FACE Act prohibits a person from, among other things:

> by force or threat of force or by physical obstruction, intentionally injur[ing], intimidat[ing] or interfer[ing] with or attempt[ing] to

---

https://www.theoaklandpress.com/2023/02/24/jury-returns-verdicts-for-6-abortion-protesters/ (Feb. 24, 2023).

>injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services[2]. . .

18 U.S.C. § 248(a)(1).

A. RED ROSE RESCUE AND ITS TACTICS

19. In or around 2015, CPLS and Miller actively participated in forming the Red Rose Rescue (RRR) group and devising methods used in RRR events to obstruct the provision of "reproductive health services."[3]

20. RRR events are part of a broad effort by Defendants to disrupt the provision of reproductive health services across numerous states.

21. In general, RRR events are a coordinated effort by anti-abortion activists to temporarily shut down reproductive health services facilities in order to impede persons from obtaining or providing reproductive health services.

22. At RRR events, two to six RRR participants physically enter a reproductive health services facility and attempt to prevent abortions from taking place by, among other things, causing a disturbance in the facility that impedes the facility's ability to provide, or patients' ability to obtain, reproductive health services.

23. Generally, RRR participants (1) enter the facility, (2) occupy space in the facility's waiting room, (3) pass out red roses to those seeking reproductive health services,

---

[2] The term "reproductive health services" means "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services related to pregnancy or the termination of a pregnancy." FACE Act, 18 U.S.C. § 248(e)(5).

[3] Monica Miller, 2020 Red Rose Rescue Conference: Why Do I Rescue? (Dec. 12, 2020), https://www.youtube.com/watch?v=q40HZ2Bv4F0&list=PL1TmA9lq8zIw0Zr38oB0Lu-C5gagMuTW7&index=7 [https://perma.cc/3JW4-2BME].

(4) protest the provision of reproductive health services, (5) refuse to leave the waiting room voluntarily, and (6) require police officers to physically remove each RRR participant from the facility.

24. RRR events are purposefully scheduled to take place on dates and times when the organizers believe abortions are scheduled to occur so the event will interfere with the provision, or obtaining, of as many abortions as possible.[4]

25. While two to six RRR participants are inside the facility, a larger group of RRR participants remains outside the facility to act as witnesses and spokespeople, and to film and photograph the event.

26. RRR participants are aware that their conduct—occupying the facility and refusing to leave—is unlawful and anticipate being arrested, jailed, and prosecuted.[5]

27. In fact, RRR participants count on a law enforcement response to their unlawful actions so that the facility will not provide reproductive health services, at a minimum temporarily, while the police are present.[6]

28. As a result, RRR participants try to remain in the waiting room, with police in and surrounding the facility, as long as possible in order to prevent as many reproductive health services as possible.

---

[4] Christopher Moscinski, 2020 Red Rose Rescue Conference: Direct Action on Behalf of the PreBorn and Their Mothers (Dec. 12, 2020), https://www.youtube.com/watch?v=NP96Ri6QE5o&list=PL1TmA9lq8zIw0Zr38oB0Lu-C5gagMuTW7&index=3&t=78s [https://perma.cc/P675-7L58].

[5] Monica Miller, 2020 Red Rose Rescue Conference: Principles of Non-Violence (Dec. 12, 2020), https://www.youtube.com/watch?v=8aDXaP45FQQ&list=PL1TmA9lq8zIw0Zr38oB0Lu-C5gagMuTW7&index=2&t=15s [https://perma.cc/BKU6-EYRA].

[6] Moscinski, *supra* note 4.

29. For example, Defendant Moscinski stated at the first Red Rose Rescue Conference in 2020, "The longer we can disrupt the normal functioning of the killing place, the better. And if you have five or six police inside, eight or ten patrol vehicles outside setting up the police perimeter, the normal business of killing the children at that place has already stopped or has certainly paused."[7]

30. Similarly, in or around July 2020, Defendant Moscinski described his participation in RRR events and how his trespass into the facilities interferes with people's ability to obtain or provide reproductive health services, "The police engage us in conversation…and we have this conversation. Sometimes it's a short conversation. I've had times with the police…we're in the waiting room sometimes up to two to three hours going back and forth and all the time that we're there, the patients are not coming through. It's a real interruption to the whole killing business there."[8]

31. RRR events are deemed "successful" when they result in a reproductive health services facility closing early or canceling appointments.

32. For example, on or around October 17, 2020, in response to an October 2020 RRR event that Defendant Laura Gies helped plan, and in which Defendant Moscinski participated, Gies proclaimed "Victory!" and "God wins when an abortion clinic cannot operate" after describing how the targeted reproductive health services facility had to cancel appointments and close for the day.[9]

---

[7] *Id*.

[8] Interview by Gene Zannetti with Christopher Moscinski, https://www.youtube.com/watch?v=SsXyeR6eXro&t=437s [https://perma.cc/UPN8-R5X8].

[9] Laura Gies, Facebook Live (Oct. 17, 2020), https://www.facebook.com/laura.a.gies/videos/10224847122864933 [https://perma.cc/FM4J-

33. In response to the same event, Defendant Miller stated, "We know from experience that as long as there is a pro-life presence inside the abortion centers the killing is halted."

B. CITIZENS FOR A PRO-LIFE SOCIETY AND MONICA MILLER'S INVOLVEMENT WITH RED ROSE RESCUE

34. Defendants CPLS and Miller manage, operate, finance, organize, and support Defendant RRR and RRR events.

35. Defendant RRR's website, redroserescue.com, is operated by Defendants Miller and CPLS.

36. Defendant Miller is the contact person for RRR's Facebook page, available at: https://www.facebook.com/red.rose.rescue.

37. The "Donation" link on redroserescue.com redirects to Defendant CPLS' webpage, which then provides information on how to donate directly to CPLS electronically or via mail.

38. Defendant RRR's website, redroserescue.com, directs people interested in participating in RRR events to contact Defendant Miller directly and provides her email address.

39. Defendant RRR also directs people to contact Defendant Miller if they want to otherwise support the RRR association, apart from attending RRR events onsite at reproductive health services facilities, such as by assisting with the website and social media, coordinating trips and events, raising money, providing prison support for RRR participants, and engaging in outreach, recruitment, promotion, and advocacy.[10]

---

T9ZS].

[10] https://www.redroserescue.com/get-involved.

40. There have been approximately 28 RRR events since 2015; Defendants CPLS, RRR, and Miller have managed, operated, financed, or supported at minimum, approximately 21 of them.

C.  DEFENDANTS' PREVIOUS RED ROSE RESCUE EVENTS AND OTHER SIMILAR CONDUCT SINCE 2017

41. In addition to the Northeast Ohio Events described in detail below, Defendants Gies, Handy, Miller, Moscinski, Smith, and Whipple have regularly engaged in unlawful and obstructive behavior while participating in RRR events at reproductive health services facilities across the United States since at least 2017, including but not limited to the following:

    a. Defendant Gies has been arrested at least four times by police departments in Michigan, New York, Pennsylvania, and the District of Columbia. Charges include obstructing the police, unlawful entry, and trespass. Gies has been twice convicted.

    b. Defendant Handy has been arrested at least nine times by various police departments in Virginia, Maryland, Michigan, Ohio, and the District of Columbia on trespass, obstructing the police, and disorderly conduct charges. Handy has also been convicted of a criminal FACE Act violation case in the District of Columbia.

    c. Defendant Miller has been arrested at least five times by various police departments in Ohio and Michigan on trespass and obstruction charges. At least one of those arrests occurred after Miller broke the terms of her probation by going within 500 feet of a reproductive health services facility. She has been convicted at least twice.

    d. Defendant Moscinski has been arrested at least twelve times by various police departments in Pennsylvania, Maryland, Michigan, New York, New Jersey, Virginia, and the District of Columbia on trespass, obstruction, unlawful entry, resisting arrest, and invasion of

8

privacy charges. He has received convictions for many of these arrests. Moscinski was also found guilty of violating the FACE Act in New York.

   e. Defendant Smith has been charged with simple assault, unlawful entry, and felony conspiracy against rights. He also pled guilty to a criminal FACE Act violation in the District of Columbia.

   f. Across two states, Defendant Whipple was present on at least two occasions where RRR participants who entered a reproductive health services facility were arrested and charged with trespass.

## IV.  SPECIFIC ALLEGATIONS ABOUT THE NORTHEAST OHIO EVENTS

42. Defendants organized, formulated, and participated in two coordinated and related RRR events in Northeast Ohio ("Northeast Ohio Events") that occurred on June 4, 2021 at Northeast Ohio Women's Center (NOWC) in Cuyahoga Falls, Ohio and on June 5, 2021 at Planned Parenthood of Greater Ohio's Bedford Heights Surgery Center (BHSC) in Bedford Heights, Ohio.

43. NOWC and BHSC are each a "facility" that provides reproductive health services as those terms are defined in the FACE Act, 18 U.S.C. § 248(e)(1), (e)(5).

   A. <u>JUNE 4, 2021 – NORTHEAST OHIO WOMEN'S CENTER</u>

44. On June 4, 2021, Defendants CPLS, RRR, Laura Gies, Christopher Moscinski, Clara McDonald, and Audrey Whipple's unlawful trespass at the NOWC in Cuyahoga Falls, Ohio resulted in the closure of a portion of NOWC's facility.

45. Several other RRR participants present during the incident include, but are not limited to: Defendants Handy, Miller, and Smith; as well as Matthew Connolly, John Hinshaw, Heather Idoni, Walter Moss, Darleen Moss, Elizabeth Wagi, and at least two unidentified individuals.

46. On June 4, 2021, at approximately 11:26 a.m., Defendants Gies and McDonald gained entrance into NOWC's waiting room via the back entrance by falsely claiming to be seeking reproductive health services.

47. At approximately 11:28 a.m., Defendants Moscinski and Whipple entered NOWC's waiting room through the front entrance.

48. At approximately 11:30 a.m., Defendants Gies, McDonald, Moscinski, and Whipple started handing out roses to the patients in the waiting room while encouraging them to not have abortions.

49. NOWC staff quickly told Defendants Gies, McDonald, Moscinski, and Whipple to leave and evacuated their patients into a secured portion of the facility.

50. While the patients were being taken out of the waiting room, Defendant McDonald forcefully grabbed a patient's body and told her not to go through with the abortion.

51. After the patients had left the waiting room, Defendants Gies, McDonald, Moscinski, and Whipple repeatedly refused to leave.

52. While in the waiting room, Defendants Gies, McDonald, Moscinski, and Whipple occupied nearly the entirety of the waiting room by laying or kneeling directly on the floor.

53. Cuyahoga Falls Police Department officers soon arrived at NOWC and told Defendants Gies, McDonald, Moscinski, and Whipple to leave.

54. Defendants Gies, McDonald, Moscinski, and Whipple refused to leave.

55. While Defendants Gies, McDonald, Moscinski, and Whipple were occupying the waiting room and refusing to leave, Defendant Gies proclaimed:

      a.      "All of you staff, your paychecks are from blood money of the innocent children you're ripping to shreds…God has a plan for your life and this is not it. Please, repent! It's not too late to stop doing what you're doing!"

      b.      "Please stop killing babies. Please stop dismembering children!"

56.    Similarly, Defendant Moscinski said to NOWC staff, "In the name of Jesus Christ, I forbid you from committing any abortions for today."

57.    While Defendants Gies, McDonald, Moscinski, and Whipple were inside NOWC with the police, Defendant Miller was immediately outside the facility and stated, "The police have arrived and hopefully [the Defendants] have an opportunity to stall as long as possible. It's our experience that as long as there is a pro-life presence inside these abortion centers, the killing is halted. And they are not going to leave."[11]

58.    By approximately 12:00 p.m., Cuyahoga Falls police arrested Defendants Gies, McDonald, Moscinski, and Whipple and physically carried them out of the waiting room, across a parking lot, and into police cars.

59.    While being transported in a police car to the police station, Defendant Gies said to the police officer:

      a.      "You just took us out of [an abortion center], we were trying to help them…stop the holocaust. Now the police in the United States are part of supporting it by taking away people that are trying to stop the holocaust."

---

[11] Interview by Mark Harrington with Monica Miller, in Cuyahoga Falls, Ohio (June 4, 2021), https://www.facebook.com/MarkCreatedEqual/videos/10159175852424920 [https://perma.cc/C8N8-5MY5].

11

    b.  "They are trespassing on the babies now that you let them [NOWC] go on with their day."

  60. NOWC also saw a disruption in their appointment schedule on the day of the RRR event.

    a.  23 appointments were scheduled to occur, but at least five patients did not show up.

    b.  Some patients rescheduled their surgical abortions to different days.

    c.  Patients also called NOWC and said they would not be coming to their appointments because they saw police gathered outside of the facility.

    d.  At least one patient had her procedure delayed until later in the day as a result of the RRR event.

  61. Defendants Gies, McDonald, Moscinski, and Whipple were found guilty of trespassing by an Ohio state court in August 2021.

  62. Through the actions described above, Defendants CPLS, RRR, Gies, McDonald, Moscinski, and Whipple, by force or threat of force or by physical obstruction: (1) intentionally injured, intimidated, or interfered with, or attempted to injure, intimidate or interfere with, persons because those persons were, or had been, obtaining or providing reproductive health services; or (2) intimidated such persons or any other person or class of persons from obtaining or providing reproductive health services.

  63. Defendants CPLS, RRR, Gies, McDonald, Moscinski, and Whipple's unlawful actions at NOWC, resulting in the closure of a portion of NOWC, made ingress to or egress from NOWC impassable and/or rendered passage unreasonably difficult or hazardous.

  B. JUNE 5, 2021 – BEDFORD HEIGHTS SURGERY CENTER

  64. Defendants continued with a related RRR event the next day.

65. On June 5, 2021, the unlawful entry of Defendants CPLS, RRR, Lauren Handy, Monica Miller, and Jay Smith into and onto BHSC's property caused the closure of BHSC for nearly an entire day.

66. Several other RRR participants present during the incident, who were also present at NOWC, include, but are not limited to: Defendant Laura Gies, as well as Matthew Connolly, John Hinshaw, Walter Moss, Darleen Moss, Elizabeth Wagi, and at least two of the same unidentified individuals present at NOWC.

67. On June 5, 2021, at approximately 8:54 a.m., Defendants Lauren Handy and Monica Miller, in conjunction with approximately five other RRR participants, entered into BHSC's private fenced-in parking lot and approached and attempted to speak to patients waiting in their cars.

68. Defendants Handy and Miller closely followed patients as they exited their vehicles and tried to force the patients to accept brochures and roses.

69. At approximately 8:57 a.m., Defendant Smith entered BHSC's building and then waiting room, which was full of patients, and began passing out brochures to the patients.

70. The patients and staff were visibly upset by Smith's behavior.

71. When a patient asked Smith to leave the facility, Smith used physical force against the patient by pushing him with his shoulder.

72. BHSC employees repeatedly told Defendant Smith to leave the waiting room, but he refused.

73. To protect the patients, BHSC staff evacuated the patients out of the waiting room and into a secured area of the facility.

13

74. A BHSC employee was eventually able to get Defendant Smith out of the waiting room and into the parking lot.

75. Bedford Heights Police Department officers soon arrived at BHSC.

76. While being questioned by police, Defendant Smith stated, "I went inside because they're killing babies in there."

77. Police officers instructed the RRR participants to leave BHSC's property and the adjoining private property where participants were congregating.

78. The RRR participants who were unlawfully trespassing refused to leave BHSC's property and the adjoining private property.

79. Next, Defendant Handy kneeled down directly in front of the entry door to Planned Parenthood's facility and refused to move.

80. While Handy was kneeling in front of the door, Defendant Miller continued approaching patients in their cars.

81. Soon, Miller laid on the ground behind a patient's vehicle, then stood up next to the patient's car door, and prevented the patient from exiting their car.

82. Bedford Heights police repeatedly told Defendants Handy and Miller to leave BHSC's parking lot, but they refused.

83. While Defendants Handy and Miller were refusing to leave BHSC's parking lot, Defendant Laura Gies was present on the adjoining private property; Bedford Heights police told her she was trespassing and to leave, but she refused.

84. At approximately 9:12 a.m., Defendant Handy sprawled her body out on the ground in front of BHSC's entrance and refused to move.

85. Within minutes, Bedford Heights police arrested Handy and physically carried her into the back of a police car.

86. Next, Bedford Heights police arrested Defendant Miller and physically carried her across BHSC's parking lot towards a police car.

87. The arrests of Defendants Handy and Miller did not de-escalate the situation or end the event, as RRR participants continued surrounding the facility and entering BHSC's property.

88. At approximately 9:23 a.m., a masked RRR participant entered BHSC's parking lot; Bedford Heights police instructed him to leave the premises or "go to jail."

89. At approximately 9:35 a.m., Bedford Heights police instructed RRR participants, who had gathered at the entrance to BHSC's parking lot, that they had to stop blocking the entrance to the private parking lot.

90. At approximately 10:01 a.m., a RRR participant climbed over BHSC's fence and entered the private parking lot.

91. Bedford Heights police confronted the RRR participant with a K-9 officer and instructed him to leave.

92. Almost immediately after the K-9 incident, a Bedford Heights Police Department supervisor informed BHSC's management about the problems the RRR event was causing and the practical obstacles the police had in managing them.

93. Specifically, the police supervisor stated:

    a. He had initially thought he could get the RRR participants to leave BHSC's property by simply telling them to, but they refused because they wanted to get arrested;

15

  b. He was willing to arrest them, but because of COVID-19, the County jail would accept only felony offenders;

  c. He could transport the RRR participants to the police station, cite them, and release them; but the RRR participants said they would simply come right back to BHSC;

  d. Despite the jail's restrictions, he was able to secure spots at the County jail; and

  e. He hoped that arresting Defendants Handy and Miller would "calm" the RRR participants, but it did not appear to do so because a RRR participant had just jumped over BHSC's fence.

94. The Bedford Heights police supervisor then asked BHSC's management if she could close the facility for the rest of the day because the Bedford Heights police had only three officers on duty—two of whom were transporting Defendants Handy and Miller to jail—and did not have the resources to handle the RRR participants' non-stop disruptive actions.

95. At the request of the police, BHSC management agreed to cancel appointments and close the facility for the rest of the day.

96. The closure impacted all staff and 24 patients.

97. Among the 24 patients, 9 had surgeries and 15 had consultations canceled, which were ultimately rescheduled.

98. Through the actions described above, Defendants CPLS, RRR, Handy, Miller, and Smith, by force or threat of force or by physical obstruction: (1) intentionally injured, intimidated, or interfered with, or attempted to injure, intimidate or interfere with, persons because those persons were, or had been, obtaining or providing reproductive health services; or

16

(2) intimidated such persons or any other person or class of persons from obtaining or providing reproductive health services.

99. Defendants CPLS, RRR, Handy, Miller, and Smith's unlawful actions at BHSC, and the subsequent closure of the facility, made ingress to or egress from BHSC impassable and/or rendered passage unreasonably difficult or hazardous.

## Count I
### Physical Obstruction, Force, or Threat of Force
### 18 U.S.C. § 248(a)(1), § 248(c)(2)(B)
### Civil Penalties and Damages
### (All Defendants)

100. The United States incorporates herein the averments of paragraphs 1 through 99.

101. Defendants' conduct as described in paragraphs 1 through 99 constitutes a physical obstruction that intentionally intimidated or interfered with persons, or an attempt to intimidate and/or interfere with such persons, because they were or had been obtaining reproductive health services, or in order to intimidate such persons from obtaining reproductive health services at NOWC and/or BHSC in violation of 18 U.S.C. § 248(a)(1).

102. Defendants' conduct as described in paragraphs 1 through 99 constitutes a physical obstruction that intentionally intimidated or interfered with persons, or an attempt to intimidate and/or interfere with such persons, because they were or had been providing reproductive health services, or in order to intimidate such persons from providing reproductive health services at NOWC and/or BHSC in violation of 18 U.S.C. § 248(a)(1).

103. As a result of the foregoing, Defendants are liable to the United States for (1) a civil penalty in the amount of not more than $20,516 for first violations and not more than $30,868 for subsequent violations, pursuant to 18 U.S.C. § 248(c)(2)(B)(i)-(ii) and 28 C.F.R.

§ 85.5, and (2) damages in the amount of $5,000.00 for each person aggrieved by Defendants' actions, pursuant to 18 U.S.C. § 248(c)(2)(B).

### Count II
### Physical Obstruction, Force, or Threat of Force
### 18 U.S.C. § 248(a)(1), 248(c)(2)(B)
### Injunctive Relief
### (All Defendants)

104. The United States incorporates herein the averments of paragraphs 1 through 99.

105. Defendants' conduct as described in paragraphs 1 through 99 constitutes a physical obstruction that intentionally intimidated or interfered with persons, or an attempt to intimidate and/or interfere with such persons, because they were or had been obtaining reproductive health services, or in order to intimidate such persons from obtaining reproductive health services at NOWC and/or BHSC in violation of 18 U.S.C. § 248(a)(1).

106. Defendants' conduct as described in paragraphs 1 through 99 constitutes a physical obstruction that intentionally intimidated or interfered with persons, or an attempt to intimidate and/or interfere with such persons, because they were or had been providing reproductive health services, or in order to intimidate such persons from providing reproductive health services at NOWC and/or BHSC in violation of 18 U.S.C. § 248(a)(1).

107. As a result of the foregoing, unless enjoined by this Court pursuant to 18 U.S.C. § 248(c)(2)(B), Defendants will continue to violate the FACE Act in the manner set forth above.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests judgment in its favor and against Defendants as follows:

    A. On Count I, impose a civil penalty on Defendants of not more than $20,516 for first violations and not more than $30,868 for subsequent violations, pursuant to 18

U.S.C. § 248(c)(2)(B)(i)-(ii) and 28 C.F.R. § 85.5, and order damages in the amount of $5,000.00 for each person aggrieved by Defendants' actions, pursuant to 18 U.S.C. § 248(c)(2)(B);

   B.  On Count II, order appropriate injunctive relief pursuant to 18 U.S.C. § 248(c)(2)(B).

Respectfully submitted,

| | |
|---|---|
| REBECCA C. LUTZKO<br>United States Attorney | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division<br><br>STEVEN H. ROSENBAUM<br>Chief<br>Special Litigation Section<br><br>MAURA M. KLUGMAN<br>Deputy Chief<br>Special Litigation Section |
| /s/ Elizabeth Deucher<br>ELIZABETH DEUCHER<br>Assistant United States Attorney<br>United States Court House<br>801 West Superior Avenue, Suite 400<br>Cleveland, OH 44113<br>(216) 622-3600<br>(216) 522-2404 (facsimile)<br>Elizabeth.deucher@usdoj.gov | /s/ Alyssa B. Wright<br>ALYSSA B. WRIGHT<br>JARED D. HAGER<br>ELIZABETH SAXE<br>BETH KURTZ<br>KATHERINE THOMPSON<br>Trial Attorneys<br>Special Litigation Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br>(202) 532-5836<br>Alyssa.wright@usdoj.gov |